UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN GILL,<br><br>       Plaintiff,<br><br>v.<br><br>RYDER INTEGRATED LOGISTICS,<br><br>       Defendant. | Civil Action No. 10-11318-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                                                                                                                                                                                                                                                   July 3, 2012

## I. Introduction

Plaintiff John Gill ("Gill") brings this action against Defendant Ryder Integrated Logistics ("Ryder") alleging that his former employer discriminated against him based on his disability when it terminated his employment. Ryder has now moved for summary judgment. For the reasons discussed below, Ryder's motion for summary judgment is GRANTED.

## II. Burden of Proof and Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing the district court the basis for its motion and identifying where there exists a lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmovant "must point to 'competent evidence' and 'specific facts' to stave off summary

1

judgment." Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal citation omitted); ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). While the Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor," Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009), it "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" Tropigas de Puerto Rico, Inc., 637 F.3d at 56 (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)).

### III. Factual Background

Unless otherwise indicated, the following are the undisputed facts.

Ryder, a provider of transportation services to commercial customers, operates a warehouse facility in Holbrook, Massachusetts to service one of its major customers, Xerox. Affidavit of Sterling Harlston, Senior Logistics Manager for Ryder ("Harlston Aff.") ¶ 2; Affidavit of Thomas Navin, Customer Logistics Manager for Ryder ("Navin Aff.") ¶ 2. The Holbrook facility employs three warehouse employees including Gill, two administrative staff and four drivers. Navin Aff. ¶ 3.

Ryder's Employment Handbook contains a policy entitled "Attendance, Punctuality and Dependability" ("the Policy"). Navin Aff. ¶ 4; Affidavit of Cheryl Andrews, Human Resources Manager ("Andrews Aff.") ¶ 2, Ex. A. The Policy states that an employee who will be late or absent from work must speak directly with his/her supervisor and that leaving a voicemail message is not sufficient notice of tardiness or absence. Andrews Aff. ¶ 2, Ex. A; Affidavit of Matthew Porter ("Porter Aff.") Ex. 1, Deposition of John Gill ("Gill Dep.") 54-56. Specifically, the Policy states,

2

"[y]ou or your representative must notify your supervisor (not by voice mail or email) each day of your absence or tardiness. Unless your operation has other requirements, you must notify your supervisor no later than one hour before your scheduled arrival time." Andrews Aff., Ex. A. The Policy further states, "[i]f your supervisor is unavailable, contact another supervisor or manager at your location or your supervisor's designee. Employees who fail to comply with this notification provision may be considered to have voluntarily resigned." Id.

Ryder hired Gill as a warehouse employee when it opened its Holbrook facility in January 2008. Harlston Aff. ¶ 3; Navin Aff. ¶ 6. Gill's position involved loading and unloading trucks and fulfilling orders as well as general shipping and receiving duties. Id. At the outset of Gill's employment, Human Resource Manager Cheryl Andrews conducted an orientation and training to explain Ryder's policies and procedures to him and other Holbrook facility employees. Andrews Aff. ¶ 2. Gill received the Policy when he joined Ryder, signed a written Acknowledgment of Receipt on January 22, 2008, Gill Dep. 54-56; Andrews Aff., Exs. A, B, and understood the Policy. Gill Dep. 56; Andrews Aff., Ex. B.

On April 3, 2008, Gill left work due to an alleged heart condition. Gill Dep. 49-50; Navin Aff. ¶ 7; Harlston Aff. ¶ 4. He remained out of work for approximately three weeks. Gill Dep. 49-50, 72; Navin Aff. ¶¶ 7-8. During this three-week period, Ryder allowed Gill to take as much time as he needed to return to work, even though it was unclear when he would return. Gill Dep. 71-75; Navin Aff. ¶ 7. Gill remained in contact with his supervisor, Customer Logistics Manager Thomas Navin, providing status updates and eventually returned to work without restrictions. Gill Dep. 75-76.

Upon Gill's return to work in late April 2008, he informed Navin that he needed to have his

3

blood tested once a week, which required him to be late to work on the day of such testing. Navin Aff. ¶ 8; Gill Dep. 77-78. Ryder agreed to accommodate Gill in this manner, but Navin told Gill that he needed to inform Navin in advance as to which day each week he would be late so that Navin could plan accordingly. Navin Aff. ¶ 8.

Initially, Gill gave Navin advance notice of the days on which he would be arriving later to work due to his blood test. Navin Aff. ¶ 9. However, Gill stopped giving Navin advance notice, which prevented Navin from being able to plan ahead at the warehouse. Id. Navin reminded Gill that he needed to inform him in advance as to which day he would be late for work. Id. Neither Navin nor anyone at Ryder ever denied Gill the ability to report to work late due to his blood tests or ever disciplined for arriving late without giving notice. Id.; Gill Dep. 92.

However, on Monday, June 23, 2008, Gill failed to appear for work at all and failed to contact Navin as required by the Policy to notify him that he would be late or absent. Navin Aff. ¶ 10; Harlston Aff. ¶ 5. Gill remained out of work for three more days from June 24 to June 26, 2008 and failed to notify Navin of his absence or otherwise inform Ryder where he was and when he planned to return to work. Navin Aff. ¶¶ 10-13. During this time, Ryder had no knowledge of Gill's whereabouts or whether he would return. Id.

On June 25, 2008, Navin's supervisor, Sterling Harlston, attempted to reach Gill by phone but was unsuccessful. Harlston Aff. ¶ 5; Navin Aff. ¶ 12. Harlston attempted to contact Gill's emergency contact. Id. Although Harlston spoke to a person he assumed was a female minor and asker her to inform Gill's emergency contact to call him, Harlston did not hear from Gill's emergency contact. Id. The following day, Navin left Gill a voice mail, asking Gill to call him, but received no response. Navin Aff. ¶ 13. As a result, Ryder decided to treat Gill's conduct as

4

voluntarily resigning from his employment. Id.; Harlston Aff. ¶ 5.

The next day, on June 27, 2008, Gill finally contacted Navin. Navin Aff. ¶ 14. Gill stated that he would be picking up his check at Holbrook. Id. When Navin asked him where he had been all week, Gill indicated that he had been in the hospital for three days due to an ankle bruise. Id.; Gill Dep. 129-30. When asked why he did not contact Ryder during that time, Gill stated that the hospital would not allow him to make a long distance phone call. Navin Aff. ¶ 14. Gill further testified that he had been out of the hospital since the prior morning, but had not contacted Ryder. Id. Gill did not offer an explanation as to why he did not report to work since being discharged from the hospital. Id. Navin informed Gill that he believed Ryder had already sent job abandonment paperwork to him because no one had heard from him all week. Id. at ¶ 15. Navin told Gill that he could pick up his check at his convenience and he did so later that morning. Id.

On July 1, 2008, Andrews spoke to Gill, explaining that the termination of his employment was based upon his violation of the Policy. Andrews Aff. ¶ 4. Andrews informed Gill that due to the Policy violation, his termination would stand. Id.

**IV.    Procedural History**

On June 24, 2010, Gill filed a complaint in Norfolk Superior Court against Ryder alleging wrongful termination of his employment based on disability due to a previous heart attack in violation of Mass. Gen. Laws c. 151B (Count I). The complaint also asserts a hostile workplace claim (Count II). (D. 1). On August 5, 2010, Ryder removed this action to this Court, asserting subject matter jurisdiction under 28 U.S.C. § 1332. (D. 1). Ryder has now moved for summary judgment. (D. 17). The Court held a hearing on the motion and took the matter under advisement.

V.     **Discussion**

   A.     **Whether Gill Has Established a Prima Face Case of Discrimination Based on Disability**

In his *pro se* complaint, Gill alleges that Ryder discriminated against him on the basis of disability by terminating his employment (Count I),which the Court liberally construes as alleging a violation of Mass. Gen. Laws c. 151B ("Chapter 151B") and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1]  The ADA prohibits an employer from discriminating against a qualified person with a disability in regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" because of his or her disability.  42 U.S.C. § 12112(a).  Similarly, Chapter 151B prohibits an employer from discriminating against a person on the basis of a handicap.

In evaluating Gill's disability discrimination claim under the ADA and Chapter 151B, the

---

[1]Count II alleges a "hostile workplace" claim.  "Under Massachusetts law, a hostile work environment is one that is 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.'"  Thompson v. Coca-Cola Co., 522 F.3d 168, 180 (1st Cir. 2009) (quoting Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 532 (2001) (further citation omitted)).  Other than an isolated comment about his blood tests, Gill has neither alleged in his complaint nor shown at this juncture that he was subjected to conduct that was extreme, humiliating, or that unreasonably interfered with his ability to work.  See Thompson, 522 F.3d at 180 (noting that "[t]he environment must be sufficiently hostile or abusive in light of all of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'") (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  However, given the allegations in Count II that Gill was subjected to a comment that his blood tests were "becoming a problem," that he "was not afforded the same treatment as every other worker in this location in terms of being able to call in sick and simply leave a message on the phone while I was in the hospital," that the "workplace was hostile" to him and that he was discriminated against because of his disability (Compl. ¶¶ 14-16), the Court construes this claim as a disability discrimination claim based on disparate treatment.

Court applies the well-established McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411. U.S. 792, 801-803 (1973); Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005) (applying the McDonnell Douglas burden-shifting framework in assessing plaintiff's disability discrimination claim under the ADA and Chapter 151B). Under this approach, Gill must first establish a prima facie case of discrimination by showing that: "(1) he suffers from a disability or handicap, as defined by the ADA and Chapter 151B, that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and that (3) [Ryder] took an adverse employment action against him because of, in whole or in part, his protected disability." Tobin, 433 F.3d at 104 (citing cases). If he is able to do so, the burden of production shifts to Ryder to articulate a legitimate, non-discriminatory reason for terminating Gill's employment and to produce credible evidence to show that the reason proffered is the real reason for that termination. McDonnell Douglas, 411 U.S. at 802; Tobin, 433 F.3d at 105. If Ryder offers a non-discriminatory reason, the burden then shifts back to Gill, and he must offer evidence to establish that Ryder's justification is mere pretext for discriminatory animus. McDonnell Douglas, 411 U.S. at 804; Tobin, 433 F.3d at 105. "The ultimate burden of proving unlawful discrimination rests at all times with [the plaintiff]." Tobin, 433 F.3d at 105 (citing Reeves v. Sanderson, Inc., 530 U.S. 133, 143 (2000)).

As previously noted, to establish a prima facie case of employment discrimination on the basis of handicap or disability, the plaintiff must show first that he suffers from a handicap or disability as defined by Chapter 151B and the ADA, respectively. Tobin, 433 F.3d at 104; Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 120 (2010). Under Massachusetts law, "handicap" is defined as: "(a) a physical or mental impairment which substantially limits one or more major life

7

activities of a person; (b) a record of having such impairment; or (c) being regarding as having such impairment . . . ." Mass. Gen. Laws c. 151B, § 1(17); see also 42 U.S.C. § 12102(2) (similarly defining "disability" under federal scheme). A "handicapped person" is defined as any person who has a "handicap" under that statutory definition. Mass. Gen. Laws c. 151B, § 1(19). Gill must demonstrate that he is "handicapped" within the meaning of Chapter 151B by satisfying a three-step analysis: (1) "whether [his] condition, actual or perceived, constitutes a mental or physical 'impairment'"; (2) "whether the life activity curtailed constitutes a 'major' life activity as defined in G.L. c. 151B, § 1(20), and its accompanying regulations"; and (3) "whether the impairment substantially limited the major life activity." City of New Bedford v. Mass. Comm'n Against Discrimination, 440 Mass. 450, 463 (2003); see Carroll v. Xerox Corp., 294 F.3d 231, 238 n.3 (1st Cir. 2002) (stating that, with some exceptions, the definitions of "disability" under the federal law are virtually identical to the definitions of "handicap" under Massachusetts law, and as such the state has looked to federal case law in interpreting the statute). "'[M]ajor life activities' means functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Mass. Gen. Laws ch. 151B, § 1(20). Further, a "substantial" limitation does not include any impairment which interferes "in only a minor way with the performance of manual tasks." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 175-76 (1st Cir. 2003). Thus, to meet his burden, Gill must present evidence that the extent of the limitation caused by his impairment is substantial. See Carroll, 294 F.3d at 238.

Although resolving "whether a person's impairment substantially limits that person's performance of a major life activity requires an individual, case-by-case assessment" and "[t]here are no bright line rules with respect to precisely how limited a plaintiff's performance of a particular

8

major life activity must be before it qualifies as 'substantial,'" Shedlock v. Dep't of Corr., 442 Mass. 844, 852 (2004), Gill has failed to submit any evidence to permit a reasonable fact finder to conclude that his prior heart attack significantly impacted a major life activity such that he suffered from a handicap within the meaning of Chapter 151B or a disability under the ADA. Gill brings forth no evidence indicating that his heart attack limited a major life activity in a substantial way. Although Gill was out of work for most of April 2008 for a heart condition, he was able to return to work with no restrictions. Navin Aff. ¶¶ 7-8. His need for weekly blood tests, which Ryder accommodated, was not a substantial limitation on a major life activity. See Navin Aff. ¶ 8; Gill Dep. 76-78. His unscheduled absences during the week of June 22, 2008 was not for any heart-related medical issue. Gill Dep. 129. Moreover, Gill has neither argued nor presented evidence that the June 2008 injury to his ankle rose to the level of a substantial impairment to give rise to a claim under Chapter 151B or the ADA. Gill's failure to point to evidence of the impact of his condition (either his heart attack or his ankle bruise) on his daily activities is fatal to his claim. See, e.g., Prescott v. Higgins, 538 F.3d 32, 44-45 (1st Cir. 2008) (finding that plaintiff was not handicapped within the meaning of Chapter 151B for his failure to show that his condition substantially limited a major life activity); Preble v. Transp. Displays, Inc., 2005 WL 2065327, *2 (D. Mass. Aug. 22, 2005) (granting summary judgment on a disability discrimination claim where, although plaintiff had to watch his diet and monitor his blood sugar, he failed to assert or offer evidence that his diabetes and heart condition impaired any life activity). Accordingly, even viewing the record in the light most favorable to Gill, no reasonable jury could conclude that Gill was handicapped or disabled within the meaning of Chapter 151B or the ADA, respectively.

Even if Gill could demonstrate he was handicapped, to the extent that he further claims that

9

Ryder failed to reasonably accommodate him to allow him to perform the essential functions of his job, the record does not support this claim. Ryder provided all the reasonable accommodations that Gill sought. It is undisputed that when Gill was out of work due to his heart attack in April 2008, Ryder allowed him to take an open-ended leave of absence, without any indication as to when Gill would return to work. Navin Aff. ¶ 7; Harlston Aff. ¶ 4; Gill Dep. 71-74. When he returned to work after three weeks, Ryder permitted Gill to arrive late to work one day per week so he could have his blood tested. Navin Aff. ¶¶ 8-9; Gill Dep. 76-78. Navin asked only that Gill provide him with advance notice when he would be late for this reason. Navin Aff. ¶ 8. Gill testified that his blood testing schedule was flexible and that he did not need to have his blood tested on any particular day of the week and that it was easy for him to move the day of the week on which he would have the test by a day or so. Gill Dep. 80-83. The record is devoid of any evidence that Gill sought any further accommodation that Ryder rejected. Therefore, there is no evidence in the present record from which a reasonable jury could conclude that Ryder failed to reasonably accommodate Gill due to his heart condition.

As to his ankle injury, the record indicates that Gill made no request for a reasonable accommodation. "An employee's obligation to request an accommodation stems from the basic principle that an employer is not required to accommodate a need that it does not know exists." Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 441 Mass. 632, 649 n. 21 (2004). The request may be unnecessary to trigger the employer's obligation in the rare circumstance that the employee's condition "makes it obvious that accommodation is required, or a condition that renders the employee incapable of making a request." Leach v. Comm'r of Mass. Rehab. Comm'n, 63 Mass. App. Ct. 563, 567 (2005); Reed v. LePage Bakeries, Inc., 244 F.3d 254,

261 n. 7 (1st Cir. 2001). Here, however, Gill was absent without notifying his supervisor of the reason for his unscheduled absences in violation of company policy. Gill did not contact Navin or anyone else at Ryder to inform them of his ankle injury, what, if any, restrictions such injury would have on his ability to perform his job functions, or why he had been unable to report to work. Moreover, once he was in contact with Ryder about his absences, he made no request for an accommodation for his ankle bruise.

> B. **Whether Ryder's Reason For Terminating Gill's Employment Was Mere Pretext for Discrimination Based on Disability**

Even assuming Gill has satisfied his burden of establishing a prima facie case of discrimination based on disability or handicap (which the Court concludes he has not), Ryder has proffered a nondiscriminatory reason for terminating his employment: Gill's violation of the Policy that he or his representative notify (not by voice mail or email) his supervisor each day of his absence or tardiness. Because Ryder has done so, the burden shifts back to Gill to show that Ryder's reason for terminating his employment was mere pretext for hiding that his disability was the real reason for the termination.

"In assessing pretext, the court must look at the total package of proof offered by the plaintiff." Benoit, 331 F.3d at 174. Gill must "clear two significant hurdles" before he is able to demonstrate pretext: first, "he must refute the clear evidence" proffered by Ryder showing that it was his violation of the attendance policy, not his disability, that was the real reason for his termination and second, he must put forward evidence that Ryder's advanced reason was a pretext disguising discrimination. Tobin, 433 F.3d at 105; Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (stating that "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the

reason given is not only a sham, but a sham intended to cover up the employer's real motive" (internal quotations omitted)).

There is evidence in the record that Gill disputes his failure to contact Ryder about his unscheduled absence during the week of June 22, 2008. In his response to the MCAD regarding Ryder's letter, Gill states that he left a voicemail with Ryder on Sunday, June 22, 2008 indicating that he would be late arriving to work on Monday, June 23, 2008, but expected to be able to report to work that day. Porter Aff., Ex. 4. Specifically, Gill stated that "on Sunday[,] June 22, I called and left a voice mail for Mr. Navin. That message clearly told Mr. Navin my medical condition was of grave concern to me and I had to see the Doctor on Monday June 23 therefore I would not be at work on time . . . It should also be noted that at the time of the call I did think that I would be at work later in the morning after the Doctor's visit." Id. at 5. Although Ryder disputes any such voice mail was left by Gill, this disputed fact is immaterial. Even if Gill left the voicemail, the Policy requires each employee or a representative of the employee to notify one's supervisor each day one is absent or tardy and explicitly states that such notification cannot be "by voice mail or email." Andrews Aff., Ex. A (Policy). When Gill left a voicemail instead of reaching Navin, his supervisor, live or have anyone communicate with Navin on his behalf, he violated the Policy. Gill continued to violate the Policy with his "no call/no show" absences when he did not communicate with Ryder through any means from June 23 to June 26, 2008 regarding his unscheduled absence from work. When asked specifically about the period of time Gill had not appeared for work the week of June 22, 2008 and whether he "let [his] supervisor know each day live that [he] [was] not going be in that day," Gill admitted that he did not do so. Gill Dep. 56. Ryder's response to Gill's previous heart attack further supports Ryder's claim that the real reason for Gill's termination was his violation of

12

the Policy, not any discriminatory animus. In response to Gill's earlier heart attack, Ryder gave him as much time as he needed to return to work, and once Gill returned to work, Ryder allowed him to arrive late to work for his weekly blood tests.[2] Moreover, Gill admitted during his testimony that he was absent from work from June 23, 2008 to June 26, 2008 due to his hospitalization for an ankle bruise (of which Ryder had no knowledge), unrelated to Gill's previous heart attack or any heart condition. Gill Dep. 129-30. Gill fails to present any evidence for a fact finder to disbelieve Ryder's stated reasons for his termination, much less that the reason disguised discrimination based on disability.

In his opposition, Gill argues that Ryder's asserted reason was pretextual because other employees had been able to leave messages with Ryder and were not terminated, but he was terminated when he did so. Pl. Opp. at 1; see also Compl. ¶¶ 11,12, 15. That is, Gill argues that the Policy was enforced against him but not others. "A party alleging discrimination may not rest on allegations made in the pleadings, but instead must point to specific evidence supporting his claim." Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011). Here, no evidence in the record supports the claim that other warehouse employees were similarly situated to Gill, but were not terminated, as he was, for violating the Policy. See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (stating that a "claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects"). In fact, the record shows that Gill and the only other warehouse employee Gill identified in his deposition,

---

[2]Gill claims that Navin told him that his reporting late to work so he could have his blood drawn was "becoming a problem," Compl. ¶ 8, which Navin denies. This disputed fact, however, is immaterial since even if the Court accepts that Navin made such statement, Gill admits that he was never denied the ability to report to work late due to his blood tests or ever disciplined for coming in late without giving notice. Navin Aff. ¶ 9; Gill Dep. 92.

Jonathan Farrow, were not similarly situated. Farrow was out of work for several days due to a personal emergency and his circumstances prevented him from having access to a telephone, except to place a single daily telephone call to his father. Farrow Aff. ¶ 5. During Farrow's absence, his father maintained contact with Navin each day, informing Navin of his whereabouts and his expected return. Id. The Policy explicitly permitted Farrow's father to contact Navin on his son's behalf as Farrow's "representative." That is, according to the present record, Farrow complied with the Policy. In comparison to Farrow, by his own admission, Gill understood he needed to maintain daily contact with Ryder concerning his situation, but failed to do so. Gill, therefore, cannot compare his circumstances with those of Farrow to support his disparate treatment claim. See Pagano v. Frank, 983 F.2d 343, 348-49 (1st Cir. 1993) (affirming summary judgment in favor of employer and rejecting plaintiff's attempt to support claim of pretext by noting that the fellow employee whom plaintiff claimed was similarly situated was not so situated).

Accordingly, based upon the undisputed record of material facts, because Gill has failed to make out a prima facie case of discrimination, Ryder has shown a nondiscriminatory reason for his termination and Gill has failed to show that Ryder's decision to terminate his employment was pretext for discrimination, Ryder is entitled to summary judgment.

**VI. Conclusion**

For the foregoing reasons, Ryder's motion for summary judgment is GRANTED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge